UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL WASHINGTON,

        Plaintiff,                                  Hon. Hala Y. Jarbou

v.                                                    Case No. 1:20-cv-558

KALAMAZOO GARDEN SOLUTIONS,

        Defendant.
_____/

**REPORT AND RECOMMENDATION**

      Plaintiff Michael Washington filed a pro se complaint against his former employer, Kalamazoo Garden Centers (KGS), alleging that KGS violated Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* by failing to promote him to the Field Manager position because of his race. In short, Washington claims that KGS's decision to rehire a former KGS Field Manager, instead of promoting him to that position, was based on unlawful discrimination.

      This matter is presently before me on KGS's Motion for Summary Judgment. (ECF No. 20.) Also before me is Washington's Motion to Dismiss due to Suppression of Evidence and Submission of False Evidence. (ECF No. 19.) Both motions are fully briefed and ready for decision. For the reasons that follow, pursuant to 28 U.S.C. § 636(b)(1)(B), I recommend that KGS's motion be **GRANTED,** Washington's motion be **DENIED**, and the case be **dismissed with prejudice**.

## I. Background

### A. KGS's Business

KGS is a merchandising company affiliated with Kalamazoo Flower Group. KGS's primary business activity is stocking and organizing garden displays in various areas of retail stores and providing related service, such as on-site customer activities that promote gardening. KGS conducts business in Michigan, Indiana, Ohio, and Illinois and services a variety of retail clients, including Wal-Mart.

David Korringa oversees KGS's Wal-Mart merchandising program as its Merchandising Program Manager. (ECF No. 20-2 at PageID.275.) The structure of the operation below Korringa employs Regional Managers, including Roseanne Siebert in Ohio, and Field Managers. (*Id.* at PageID.276.) The program also relies extensively on hourly, part-time, seasonal positions, including Merchandisers, Lead Merchandisers, and a discretionary position of Senior Lead Merchandiser. Employees in the Merchandiser positions generally work each year from March through October and do not perform direct management functions. (*Id.*)

KGS employees must be trained on, and certified in using, TAP and VOLT, two Wal-Mart-specific phone applications that are used as part of the Wal-Mart merchandising program. (ECF No. 20-3 at PageID.293; ECF No. 20-10 at PageID.332.)

### B. KGS Hires Washington

KGS hired Washington as a seasonal Lead Merchandiser on February 10, 2017, at a rate of $13 per hour—the top of the pay scale for the position. (ECF No. 20-3 at PageID.284–85.) Prior to the time he applied to KGS, he had worked for Plant Partners, Inc. (PPI) for two or three years, where he originally started as a part-time merchandiser and was eventually promoted to field coordinator. (*Id.* at PageID.288.) Prior to his time with PPI, Washington operated/managed his family's deli restaurant for about three years. (*Id.* at PageID.289–90; ECF No. 21-2.) He also had

worked at Plant Essentials for two years from 2005 to 2007, where he trained staff and performed management duties. (ECF No. 20-3 at PageID.290.) Finally, he also had a sales busines, in which he was "more of an investor." (*Id.* at 287–88.)

Washington learned of the position with KGS through an advertisement and then contacted Terri Lammers, a KGS Field Manager who had supervised Washington at PPI and became his supervisor when he started at KGS. (*Id.* at PageID.282.) Washington worked as a Lead Merchandiser in the Cincinnati area. His position ran from approximately March through October, depending on the volume of work in a given season. His hours varied from 30-39 per week over the time he was with KGS. At the end of each season, he was "laid off," with the understanding that he could return to work with KGS the next season. (*Id.* at PageID.285–86.) Washington reported directly to the Field Manager. His position did not include management duties, although he was required to train and monitor Merchandisers. (ECF No. 20-4.)

Washington worked with KGS during the 2017, 2018, and 2019 seasons. Lammers was his supervisor for the 2017 season and into the summer of the 2018 season, when she left KGS for a different job. (ECF No. 20-3 at PageID.282, 295.) When Lammers left, Regional Manager Nick Hudson took over for a short time, until Britni Taylor was moved internally to fill the Field Manager position. (*Id.* at PageID.282.)

C. **Washington Applies for the Field Manager Position**

In February 2019, Taylor internally transferred to the Indianapolis area, leaving an opening for the Field Manager position in the Cincinnati area. (*Id.* at 299.) After Taylor informed Washington about the opening, he decided to apply for it. The job description for Field Manager provides:

> The primary functions of the Field Manager are to develop and maintain professional, positive relationships across multiple levels of Wal-Mart operations, recruit, hire, and train leads and merchandisers on proper merchandising

3

>operations, execute various tasks to support the TAP program as needed, and gather and compile data to assist Kalamazoo Flower Group and other suppliers in monitoring and managing their product quality and performance.

(ECF No. 20-5.) The position is full-time and requires two-to-four years' management experience.

On February 15, 2019, Siebert, the Regional Manager, interviewed Washington for the position. (ECF No. 20-3 at PageID.300.) Siebert did not decide right away, but asked him to do a second interview. Around the same time, Lammers, who had previously held the Field Manager position and supervised Washington, also applied for the position. (*Id.* at PageID.300–02.) On March 5, 2019, Korringa and Siebert interviewed Lammers and Washington for the position. They interviewed Lammers first, asking her a series of questions and taking notes on her answers. They then interviewed Washington, and asked him essentially the same questions.[1] (*Id.* at PageID.303.)

Following the interviews, Korringa and Siebert discussed the candidates and compared their relative qualifications. Based on all of the information they had, they determined that Lammers was substantially more qualified than Washington, given that: (1) she had already successfully performed the Field Manager position for KGS for multiple years; (2) she had more management experience; and (3) she possessed the skills that KGS wanted at that time. (ECF No. 20-2 at PageID.278.) In addition to her years at KGS, Lammers had managed the Wal-Mart TAP Program in Southwest Ohio as a district manager for PPI from 2013 to 2017 and participated in developing and introducing the TAP program in 2012. (ECF No. 20-9.)

KGS offered Lammers the Field Manager position in March 2019, and she was recertified for the TAP and Volt applications upon rehire. (ECF No. 20-10 at PageID.332.) Washington

---

[1] The notes from the interviews indicate that Lammers was early for her interview and followed up with a "thank you" email within twelve hours, while Washington was late for his interview and did not follow up afterward. (ECF No. 20-7; ECF No. 20-8.) I note that Washington disputes that he was late to the interview. Whether he was on time or late to the interview is not material to the legal analysis in this case.

worked for KGS as a Lead Merchandiser for the remainder of the season and voluntarily left the company at the end of 2019.

Washington filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) in September 2019, alleging that KGS failed to promote him due to his race and/or gender. The EEOC dismissed the charge on March 20, 2020, and issued a notice of right to sue. (ECF No. 20-12.) Washington filed his complaint in this case on June 18, 2020, alleging that KGS failed to promote him on the basis of his race on February 15, 2019 and March 5, 2019.[2] (ECF No. 1 at PageID.4.)

## II.  Discussion

### A.  Washington's Motion to Dismiss

Citing Federal Rule of Civil Procedure 12(b)(3)(c), Washington has filed a motion to dismiss this action and requests that the Court award him $115,000. He also requests a new trial. (ECF No. 19 at PageID.98.) The bases for his requests are: (1) KGS has never produced a copy of Washington's resume (or resumes) that he submitted in connection with his initial application to KGS in 2017 and/or in connection with his application or request for a promotion in 2019; and (2) KGS has submitted false information because the typed interview notes that KGS provided do not perfectly align with the handwritten notes from the interviews. (*Id.* at PageID.90–92, 95–96.)

---

[2] Washington's discrimination claim is limited by both his complaint in this case and his charge filed with the EEOC to the alleged failure to promote him in 2019. Although Washington has indicated that he believes he should have been considered for the Field Manager position in 2018 when Britni Taylor assumed the Field Manager position (ECF No. 26 at PageID.587–88), he failed to exhaust this claim with the EEOC and did not allege it in his complaint. Moreover, Washington testified in his deposition that his claim was limited to the two dates in his complaint. (ECF No. 27-2 at PageID.819–20.) Finally, Washington conceded that he has no information pertaining to the process by which Taylor assumed the Field Manager position or her qualifications for the position. (*Id.* at PageID.821.)

The motion is a strange creature. Rule 12(b)(3)(c) does exist. Rule 12(b)(3) authorizes a motion to dismiss for improper venue, but no party has ever argued that venue in this district is improper, and it is too late in the day to raise that issue. Moreover, no trial has occurred, so there is no need for a new trial. KGS posits that it might be a motion for judgment on the pleadings pursuant to Rule 12(c), or alternatively, a motion to compel, in which case it requests costs pursuant to Rule 37(a)(5)(B) because Washington already has a copy of his resume; in fact, *he* produced it to KGS. (ECF No. 24 at PageID.430–32.) The motion might also be considered a motion for spoliation sanctions. In the end, however, its genus and species are neither here nor there because it lacks merit.

Washington does not claim that he does not have a copy of the resume. In addition, KGS notes that, although Washington's interrogatory asked KGS whether it was aware of his previous management experience with any other plant merchandising company, he never asked KGS to produce a copy of his resume. (ECF No. 24-4 at PageID.460.) KGS also notes that it produced a copy of Washington's entire personnel file, including his initial application and other documents that were responsive to his request. (EFC No. 24-4.) However, the file did not contain a copy of the resume.

The crux of Washington's motion, as I understand it, is not that he does not have a copy of the resume, but that KGS is hiding the fact that it has or had a copy of the resume in 2019 when it made the Field Manager decision because it admitted in its discovery response that it was aware of whatever information Washington provided with his application and resume. Washington contends that KGS's possession of the resume is material because it shows discrimination—KGS considered Lammers's "total qualifications" but not his "total qualifications" set forth on his resume. (ECF No. 19 at PageID.92.) This convoluted argument is unpersuasive. First, it assumes

6

that KGS actually had his resume, but in his deposition, Washington could not even say for sure whether he actually submitted it to KGS: "I gave them – also, I mentioned *I'm pretty sure* I gave them a resume . . . ." (ECF No. 20-3 at PageID.290 (emphasis added).) The fact that the resume was not in Washington's personnel file tends to show that he did not provide it to KGS. But even if KGS had a copy in the personnel file, what would it show? Because Washington believes that he was vastly more qualified than Lammers, he contends it would show that KGS must have ignored his "total qualifications," otherwise, he would have been selected for the position. Apart from his personal opinion and speculation, Washington has nothing to support this theory. If KGS in fact had the resume, Korringa and Siebert could have considered Washington's "total qualifications" and still easily concluded that Lammers was more qualified. After all, she actually performed the Field Manager position for KGS for several years (whereas Washington had not), had handled the Wal-Mart account as a district manager with PPI for several years before that (whereas Washington had not), had many more *recent* years in an actual live goods management position than Washington, and had been involved with the TAP program since its inception. Or, maybe Korringa and Siebert just missed the obvious, which might suggest sloppy decision-making but not intentional discrimination. However, this is all speculation because there is no evidence in the record supporting Washington's hypothesis. The same is true for Washington's claim about the interview notes.

Accordingly, I recommend that Washington's motion to dismiss be denied.

**B.     Motion for Summary Judgment**

Summary judgment is appropriate if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Material facts are facts that are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty*

7

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return judgment for the non-moving party. *Id.*

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

A plaintiff may establish a prima facie case of discrimination by introducing either credible, direct evidence of discriminatory intent or by circumstantial evidence through the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Because Washington presents no direct evidence of discrimination, he must establish his claim through the *McDonnell Douglas* framework, which involves three steps:

> The plaintiff must first submit evidence from which a reasonable jury could conclude that he or she established a prima facie case of discrimination. If the plaintiff does so, the defendant must then offer admissible evidence of a legitimate, nondiscriminatory reason for its action. Finally, if the defendant succeeds in this task, the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination.

*Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009) (cleaned up).

In a failure-to-promote case, such as this, a plaintiff can establish a prima facie case of discrimination by showing that: (i) he is a member of a protected class; (ii) he applied for and was qualified for the promotion; (iii) he was considered for and denied the promotion; and (iv) another employee with similar qualifications who was not a member of his protected class received the promotion. *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 240 (6th Cir. 2005) (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 562–63 (6th Cir. 2000)). The Sixth Circuit has noted that "the plaintiff's burden at [this stage] is relatively light." *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 473 (6th Cir. 2002). Nonetheless, the plaintiff must still establish an inference that the

employment decision was motivated by unlawful discrimination. "The salient issue in a Title VII claim of discrimination is whether the plaintiff was singled out because of [his] membership in a protected class and treated less favorably than those outside of that class, not whether [he] was treated less favorably than 'someone's general standard of equitable treatment.'" *Corell v. CSX Transp., Inc.*, 378 F. App'x 496, 505 (6th Cir. 2010) (quoting *Batts v. NLT Corp.*, 844 F.2d 331, 337 (6th Cir. 1988)).

Washington's claim fails at the prima facie stage because he cannot show that he was similarly situated to Lammers. *See Anthony v. BTR Auto. Sealing Sys., Inc.*, 339 F.3d 506, 515 (6th Cir. 2003) (noting that the fourth prong in a failure-to-promote case requires that the person outside the plaintiff's protected class be "similarly-situated"). To be similarly-situated, "[t]he plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). "[R]ather, . . . the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in 'all of the relevant aspects.'" *Id.* (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994) (emphasis added)). Washington and Lammers were not similarly situated for several reasons. First, Washington, who was a Lead Merchandiser, was seeking a promotion. Lammers was not seeking a promotion. Instead, she was seeking to be rehired into her former position—the Field Manager position that she had left less than ten months prior to the interview. *See King v. Enterprise Leasing Co. of Detroit*, No. 03-71778, 2007 WL 1806208, at *46 (E.D. Mich. June 21, 2007) (concluding that a plaintiff sought a promotion via transfer was not similarly situated to employees were transferred and not promoted); *cf. Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 379 (6th Cir. 2002) ("The younger nurses that Weigel identifies are not similarly situated to her insofar as they did not resign and then seek to be rehired by BHET."). Second,

9

Washington was a Lead Merchandiser who had never held the Field Manager position at KGS, while Lammers had successfully held the position with KGS for several years. *See Hiser v. Grand Ledge Pub. Schs.*, 816 F. Supp. 2d 496, 503–04 (W.D. Mich. 2011) (holding that the plaintiff teacher/reading specialist was not similarly situated to a comparator, an administrator for the school district). Finally, an objective comparison of Washington's and Lammers's qualifications undermines any argument that they were similarly situated.[3] The fact that Lammers already had several years of experience in the position, whereas Washington did not, alone renders Lammers non-comparable. *See Kariuki v. Comair, Inc.*, 832 F. Supp. 2d 771, 779 (E.D. Ky. 2011) (comparator who had six years of avionics experience was not similarly situated to the plaintiff, who had almost no experience in avionics). Moreover, in addition to her KGS experience in the Field Manager position, Lammers had at least four years of managerial experience with the Wal-Mart account at PPI immediately before taking the position with KGS. Although Washington contends that he too had live goods managerial experience, it was for only about two years with Plant Essentials, over ten years before he applied for the Field Manager position with KGS.

Given that Washington has not established a prima facie case, there is no need for further analysis. Nonetheless, for the sake of completeness, it is worth noting that Washington has presented no basis to establish that KGS's legitimate, nondiscriminatory reason for hiring Lammers instead of Washington (she was more qualified) is pretext. In the context of a failure-to-promote case, the Sixth Circuit has said:

---

[3] In *White*, *supra*, the court warned against conflating the fourth prong of the prima facie case in a failure-to-promote case with the employer's legitimate, nondiscriminatory reason at the second step. 429 F.3d at 242. However, because a court must assess whether a comparator is similarly situated, necessity requires it to "conduct an independent review of the relative qualifications of the plaintiff and the person selected for the position based on the evidence presented in order to determine whether the plaintiff has satisfied the fourth prong of her *prima facie* burden." *Id.* at 243.

> Relative qualifications establish triable issues of fact as to pretext where the evidence shows that either (1) the plaintiff was a plainly superior candidate, such that no reasonable employer would have chosen the latter applicant over the former, or (2) plaintiff was as qualified as if not better qualified than the successful applicant, and the record contains "other probative evidence of discrimination."

*Bartlett v. Gates*, 421 F. App'x 485, 490–91 (6th Cir. 2010) (quoting *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 627–28 (6th Cir. 2006)). Neither circumstance is present. As set forth above, Washington was not a plainly superior candidate, nor was he "as qualified as if not better qualified than" Lammers.

Washington's arguments in support of his claim of discrimination based on his own speculation and opinion require little, if any, discussion. However, a few things are worth noting. First, the fact that Washington was interviewed twice and Lammers was interviewed once is not proof of discrimination. KGS did not reject Washington after his interview with Siebert, and it was not obligated to hire him for the position, even if there were no other candidates at the time. Moreover, Washington acknowledged that Korringa, who had just begun overseeing the Wal-Mart program, was present during the second interview. (ECF No. 20-3 at PageID.301.) It is thus likely that Korringa wanted to be involved in the interview process, necessitating that Washington participate in a second interview. Second, although Washington claims that he was asked different questions than Lammers, he conceded that the questions were essentially the same (*id.* at PageID.303), and there is no indication that any slight variations in the questions had any impact on the hiring decision. Finally, even if Washington had performed some of the Field Manager duties in 2018 in between Lammers's and Taylor's tenures, or after Taylor left in 2019, those brief periods did not make him as qualified or more qualified than Lammers. Washington had never held the position of Field Manager, so even if he did perform *some* of its duties for short periods of time, such brief and limited experience is incomparable to several years of full-time experience in the position.

11

Therefore, KGS's motion should be granted.

### III. Conclusion

For the foregoing reasons, I recommend that the Court **deny** Washington's motion to dismiss (ECF No. 19), **grant** KGS's motion for summary judgment, and dismiss this action with prejudice.

Dated: July 19, 2021
        /s/ Sally J. Berens
        SALLY J. BERENS
        U.S. Magistrate Judge

### NOTICE

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).